IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

UNITED STATES OF AMERICA,     )
                              )
          Plaintiff,          )   Case No. 3:26-cr-00007-IM
                              )
     v.                       )
                              )
LUIS NINO-MONCADA,            )   January 21, 2026
                              )
          Defendant.          )   Portland, Oregon
_____)

**REVIEW OF DETENTION HEARING**

TRANSCRIPT OF PROCEEDINGS

BEFORE THE HONORABLE JEFF ARMISTEAD

UNITED STATES DISTRICT COURT MAGISTRATE JUDGE

APPEARANCES


FOR THE PLAINTIFF:        Mr. Thomas H. Edmonds
                          United States Attorney's Office
                          1000 S.W. Third Avenue, Suite 600
                          Portland, OR 97204


FOR THE DEFENDANT:        Mr. Michael Benson
                          Ms. Peyton Lee
                          Federal Public Defender's Office
                          101 S.W. Main Street, Suite 1700
                          Portland, OR 97204


SPANISH INTERPRETER:      Mr. Andre Knaebel


COURT REPORTER:           Bonita J. Shumway, CSR, RMR, CRR
                          United States District Courthouse
                          1000 S.W. Third Ave., Room 301
                          Portland, OR  97204
                          (503) 326-8188

(P R O C E E D I N G S)

(January 21, 2026; 1:48 p.m.)

* * * * *

THE COURT:  Mr. Edmonds.

MR. EDMONDS:  Thank you, Your Honor.

THE INTERPRETER:  May the interpreter consult with counsel?

THE COURT:  Yes.

THE INTERPRETER:  I think I solved the problem.  It was user error.

MR. EDMONDS:  Good afternoon, Your Honor.

Your Honor, the next matter on your docket is a detention hearing in United States versus Luis Nino-Moncada, Case No. 3:26-cr-7, assigned to Judge Immergut for trial.

Your Honor, Tom Edmonds for the United States.  The defendant is present in the custody of the U.S. Marshal.  He's represented today in court by Mr. Benson and Ms. Lee. Mr. Knaebel is interpreting for the Court and for the defendant.

And we're ready to proceed.

THE COURT:  Mr. Benson.

MR. BENSON:  Michael Benson, along with Peyton Lee, and we represent Mr. Nino-Moncada.

And we're ready to proceed.

THE COURT:  Why don't we have the government proceed,

as it's the government's burden.

MR. EDMONDS:  Thank you, Your Honor.

Your Honor, the parties have both submitted documents to Court in the form of memoranda, and I believe that I've covered the government's position in my submissions, but in order to elucidate our position to the Court today, it was 15 to 30 seconds that the defendant had to consider what was in front of him when he was lawfully confronted by six ICE officers on January 8th of this year.  They were outside his vehicle that he was in complete control of.  The person that was with him in the vehicle was in the passenger seat.  Both of those individuals were subject to immigration law and to apprehension and arrest by those officers.  Their commands to both occupants were entirely lawful.

And for that 15 to 30 seconds, the defendant considered what to do, and he made a conscious choice to fight his way out of that apprehension.  And in his hands, so to speak, he had a very potent weapon.  The Court has heard about that weapon in the submissions that I made, but to be clear about it, it was a Toyota Tacoma pickup truck with a curb weight of 4315 pounds.  It had a 3.5-liter V6 engine with 278 horsepower.  It had a two- to three-inch lift kit installed. It was 50 inches off the ground at the hood level, and 44-some inches all the way to the windshield.  It's a very imposing weapon to have in one's hands.

And how did the defendant wield that weapon?  Well, we know what he did from the facts that we've submitted to the Court.  He put the truck in gear, he backed it up at a high rev.  Some of the witnesses said that it appeared that he was flooring the gas pedal.  And that vehicle not only went backwards into the blocking vehicle that was perpendicular to the truck at a distance of about 5 feet, crashing into that vehicle, it also turned its wheels so that the angle of the truck changed.  And when it did so, it struck the officer who had been outside the passenger window of that truck, giving commands for them to get out of the vehicle.  Those commands were completely ignored.  Commands came from the passenger's side and from the driver's side.  There was no doubt to the occupants of that vehicle that the officers who were there were ICE officers.

The defendant made statements later on that night that he knew they were ICE officers.  They knew they were law enforcement.  And the defendant knew that the consequence of his arrest was deportation to Venezuela, because a final order of removal had been issued against him as a result of his failure to appear in a Denver, Colorado hearing in which he had full notice.  He had signed the notice, he had signed and acknowledged that he needed to appear, and he failed to appear. So he knew in his own mind the consequences of what he was facing, and he chose to fight it out.

And so back to where he's wielding this weapon.  He's reversed the truck, he's changed the angle of the truck so that the front right end of that truck hits the officer in the chest.  And then once he crashes into the vehicle behind him, he accelerates forward.  And the angle of the truck having changed now puts that officer, the one who had been on the passenger's side, in the direct path of this very significant truck -- the Court has seen the pictures of the front end of that truck -- coming towards him.  And as this second or two transpires, that officer is able to unholster his weapon and is able to fire shots into the driver's side window, escaping the truck's hitting him as it goes forward with great speed.

Now, what was the speed?  It was a 5-foot distance between the back of that truck and the car behind it.  So he didn't have a huge chance to accelerate, but certainly acceleration enough to be a significant threat to the life of that officer who was in front of him.  And that's what he's charged with.  A complaint was signed by another United States magistrate, the grand jury indicted him with assault and depredation of property, and those charges are now before the Court as the means of evaluating both the flight risk and the danger.

And we submit that inherent to the charges in this case, and the facts that I've just discussed, there is clear flight.  Flight is not disputed by the defense.  They haven't

taken any issue with the fact that he fled and got away that time.  So flight is axiomatic to this particular set of facts and vital to the Court's flight risk analysis as to what would happen were he released and to have to be apprehended again by law enforcement.

On danger, danger is inherent to this incident.  No one can quibble with the fact that this was an incredibly dangerous incident in the parking lot of a public location. The photographs the Court has seen in our submissions make it clear that the debris field from the damage done to that government vehicle looks like something out on the highway after a major crash, not some fender bender in a parking lot. This was a massive amount of damage done to that vehicle.  It tore the whole front end of that vehicle off.

So we submit that the Court has before it a very strong situation to evaluate in terms of flight risk and danger, in and of itself.  And I haven't even addressed this defendant's background.

We made submissions on this defendant's background about his involvement with prostitution, with a shooting incident last summer, with multiple traffic violations, where he's been stopped -- I think it was eight times in the course of only a several-month period.  Most people go their whole lives without being stopped in a traffic stop for speeding once or twice in their lifetime, and in just a few months, he was

stopped eight times and convicted each time of those traffic violations. He's a scofflaw. He doesn't follow restrictions, he doesn't follow the law. And this Court can't expect him to follow the law upon release.

Pretrial Services has made a recommendation to the Court of detention, and they do so very effectively, because I see in that report they consider the facts and circumstances of the case, as the Court is obligated to under the statute. Inherent to this event is flight risk and danger, and on those submissions, we ask the Court to detain the defendant.

Unless there are questions that I can answer for Your Honor.

THE COURT: Can you expand a bit on the involvement in the shooting incident? You said something about involved in a shooting incident.

MR. EDMONDS: The shooting incident was in the summer of last year, and the facts surrounding it that the government understands is that Mr. Nino-Moncada was driving and associated with his girlfriend, who is Adult Female 1, as described in the pleadings we've submitted. She was working as a prostitute regularly, and he was driving her as part of that work she was doing. She got into a dispute with customers -- or a customer of hers.

THE COURT: Hang on. So the defendant is the boyfriend of this woman. So what's the evidence that --

between driving with her and driving her as part of her work? The relationship, they're driving together in the same vehicle?

MR. EDMONDS:  Well, they are.  He was driving her to the dates that she was having as a prostitute.  That's evidence in the case that the government is aware of.  And this was going on regularly.  She was working regularly as a prostitute, and that there were multiple occasions where he was involved in driving.  They shared several vehicles.  The Tacoma was one of them.

And on this particular day in the summer of last year, she got into a dispute during the course of one of her transactions with a customer or customers, and she contended that her money had been stolen and that they had forcibly had sex with her.  And she called the defendant to come and get her and drive her away from that location.

Once they had driven away from that location, she then called in their gang associates, as the government understands it, who were related with TdA, the gang that we've described in our pleadings, and those individuals came back to that location and retaliated against those individuals.

THE COURT:  Was Mr. Nino-Moncada involved in that?

MR. EDMONDS:  Well, he was involved to the extent that he picked her up and took her away and then she got the others to come.

THE COURT:  He took her from a bad situation and she

called someone else?

MR. EDMONDS:  Yes, Your Honor.  And the associations between her and him with these other individuals have been part of the investigation and part of the case that we're aware of.

We're not suggesting, and we didn't make an argument to the Court that he's a gang member or that he fired shots, but we're saying that there are associations with him in this gang circle of individuals who were active in Portland back in the summer of 2025.  And we're not making a submission that you ought to detain on the basis of him being a gang member.  I want to be clear about that.  We didn't argue that.  But it's part of his background, the fact that he's driving around with a known prostitute engaged in that activity.

He's not lawfully here in the United States.  He's not conducting himself lawfully.  Eight times he gets stopped by the police for traffic violations.  This isn't someone who is just going to work every day and being a solid taxpayer.  That's not what this defendant was about.  And it's elucidating to the facts in his background for the Court to be aware of that in evaluating his reliability.

THE COURT:  All right.  Mr. Benson.

MR. BENSON:  Thank you, Your Honor.

Eight stops, not one hold.  Eight stops.  All the information that we have is that he pulled over, accepted service of the ticket, and followed the process eight times.

That's consistent with all the information that we have about Mr. Nino-Moncada's background, where he was forced to flee Venezuela because of political persecution there.  He had a run-in where he was attacked by law enforcement there, but he has no criminal record there.  He's not from a part of Venezuela where Tren de Aragua operates.  He came to the United States looking for work, and the people that know him don't find him to be violent, don't find him to be associated with guns.  In fact, the government's own -- and I don't understand how it fits into their oral presentation, but their own evidence about Tren de Aragua is when his girlfriend is raped and robbed while engaged in sex work, when she's looking to go back, to return and get her property back, the person that she turns to is not Mr. Nino-Moncada, because that's not his character.  That's not the kind of person that he is.

Eight times.  What's different about this time?  The government says they sat there for 15 or 30 seconds.  I don't know.  I'm aware of studies that show that people are inaccurate in reporting how long things like this take place.  Putting that aside, he's not sitting there for 15 to 30 seconds with nothing happening, with a warrant being presented to him, paperwork, a police car there, lights on.  He got to the end of those 30 seconds, as I read the government's filing, what happens is they start trying to break the window to his car.  He's sitting there in a hospital parking lot with his

girlfriend who is scared.  He's been given only 15 to 30 seconds, and that's long enough that we start escalating to the point that we are breaking the window and --

THE COURT:  I want to make sure I have the chronology correct.  Mr. Edmonds said that agents -- Border Patrol agents identified themselves and issued a command.  Is that correct?

MR. BENSON:  Yes, that's their submission.  I wasn't -- you know, we'll learn more about what happened, but given that there's six people wearing masks -- I mean, they're otherwise marked as law enforcement.  I highly doubt that a situation like this was organized in the way that that suggested:  Hi, how are you doing?  I'm officer so and so with Border Patrol and I'd like to talk with you today.

That's not even how it's described here.  They're sitting there locking the doors, and in 15 to 30 seconds, they break the window.  And according --

THE COURT:  I'm sorry.  I just want to make sure.  Border Patrol agents, six of them.  I think Mr. Edmonds said that Mr. Nino-Moncada understood that they were ICE agents.  We do have a record that they issued a command, and that is -- and then Mr. Nino-Moncada didn't obey that command.  Is that -- is that what happened here?

MR. EDMONDS:  Yes, Your Honor.  He was given multiple commands from both sides of the vehicle.  It was coming from the passenger's side and the driver's side, and for a lengthy

period of time, he failed to comply.  He looked straight ahead as if he was considering what to do.  The female then shook her head no, we're not getting out, and she tried to lock the passenger door manually.  And after this significant period of time of noncompliance was -- it was only then that an officer attempted to break the driver's window.  But the defendant had already failed to comply for a significant period of time up to that point.

THE COURT:  All right.

MR. BENSON:  They're sitting in a hospital parking lot and then they're breaking in the window.  And as I read this complaint -- as I read, I'm sorry, this memorandum -- and this is from what I take it, this is the account of -- this is very different from the complaint, and I take this to be the account of the individual that shot Mr. Nino-Moncada, what he was doing.  It was only at that point that the car moves.  Only at the point that the window is being broken in, at that moment that the car moves.

What's more, as I read this memorandum, most of the damage to that vehicle that's photographed occurs after he's been shot twice.  The circumstances that he's in, given the broader reporting that he would have been familiar with, that anyone would be, are not the same as a traffic stop.  They're almost deliberately designed to be the kind of circumstances that elicit a kind of panic response.

And the thing that concerns me about this, as I was thinking about this, the one thing that can happen in the criminal justice system is it's kind of like almost the rest of Mr. Nino-Moncada's life matters.  He's a dangerous person and he's violent and he's going to run and flee.  And that's all based on one data point of what he does, by their own information, after they start breaking the window to the truck.

I don't think that there's any study that would suggest the counterintuitive result that that's a very good prediction of how Mr. Nino-Moncada would behave on pretrial release.  I don't think there's a very good reason to think that that indicates that he is suddenly a violent person who will run and who can't be controlled, given the other information that we have about him.

With respect to the shooting, I want to repeat, he -- I'm not aware of any allegation that he was present for anyone being shot.  And when we say his associates, the only piece of information that I've been presented is that he was once in the same room with some unnamed individuals who someone else claims are part of Tren de Aragua.  There's no information that he was involved in the shooting in any active way.  There's no information that he was -- that he encouraged it.  There's no information really that he even knows the people that were called in to deal with this rape and robbery.

I did want to make sure the record is clear.  My

understanding -- I think maybe there's more information. They're not ICE agents, they're Border Patrol.  He does say ICE afterwards, that true, but my understanding is these are Boarder Patrol agents, not ICE agents.  Maybe I'm mistaken there, but that's my understanding, based on what I've read.

That's my presentation.

THE COURT:  The government moves on the basis of risk of flight.  We have the Pretrial report recommending detention. I think what's gotten lost in these presentations is Mr. Nino-Moncada, thinking about risk of flight, someone who is not here legally, what we often do is compare community ties here to community ties in Venezuela.  It's my understanding that Mr. Nino-Moncada doesn't really have community ties here, that the person who he was most tied to, as I understand it, is in ICE custody now and there really isn't anyone left.  He's been in Seattle, he's been in Colorado, and that's just the last couple of years, but still even fair recently.

So can you talk about that?

MR. BENSON:  There are three points I'd make, Your Honor.  First, you know, I think the evidence suggests that our focus on community ties may be a little misplaced because people who have immigration detainers actually appear for court at a higher rate than people without them.

The second point that I would make is, you know, that -- I think that that makes actually more sense for someone

who has no community ties to Oregon and only community ties to Maine than someone whose community ties are in Venezuela.  How is he going to get there?  He's just been shot.  There's this type of next step where Mr. Nino-Moncada flees to Venezuela somehow without getting apprehended, and takes what is actually a pretty arduous journey through the desert and across railroads to get there.  He can't just get on a plane and go there.  He doesn't have the resources to hire someone to take him there.  And so this notion that he's a flight risk because he doesn't have a lot of friends and family here, I think is cut against by the fact that there just isn't really a mechanism for him to go anywhere but here, and, in fact, his best ties are here in Oregon at the place that we found for him, where he will get room and board, a place to stay, people who care about him, people who can take him to his medical appointments.  There really isn't a good other place for him to go.

And finally -- and I've alluded to this a little bit. I mean, he needs to go to the doctor, and he's going to need to go to the doctor on a regular basis for the foreseeable future. His health puts him in a position where I don't think that there's a strong risk that he's going to want to flee in order to get out of this case.

THE COURT:  Anything else?

MR. BENSON:  No, Your Honor.

THE COURT:  Anything else, Mr. Edmonds?

MR. EDMONDS:  Your Honor, I'll just follow up with what was said here very briefly that flight risk is not him necessarily going to Venezuela.  It's about whether he's going to appear in court and adhere to conditions.  And the evidence before the Court would suggest very strongly that he will not, and that that flight risk has an inherent danger to him based on what he did only about 12 days ago.

THE COURT:  Thank you.

So I find that the government has met its burden on both risk of flight and danger to the community.  And first and foremost is the behavior the night of the arrest.  Extremely violent incident that Monday --

THE INTERPRETER:  I'm sorry, Your Honor.  The interpreter missed that.  Extremely violent incident that --

THE COURT:  That Monday, I think.  Monday.  It was a Monday, right?

MR. EDMONDS:  Yes, Your Honor.

THE COURT:  There was an officer who was threatened by the vehicle.  I think in the briefing, Mr. Nino-Moncada references the shooting in Minneapolis perhaps as a reason for his panic, but that almost cuts in the other direction, to seeing someone driving a vehicle surrounded by ICE agents counsels one to comply with instructions.

You know, the other thing is just yes, defendant was

found in some hostile situations, but the ties in the community nevertheless, which I think is a specific factor under the Bail Reform Act, is significant. They're just not here. That's significant for both risk of flight and danger to the community. We just don't have a history of a structure here.

Also concerning to the Court is yes, there was no eluding in the series of traffic stops, but just again using a vehicle in a very unsafe manner repeatedly is just really concerning just to see that frequency in that short period of time just disobeying traffic laws.

So for those reasons, I find the government has met its burden on both prongs.

Anything else?

MR. EDMONDS: Not for the government. Thank you very much indeed, Your Honor.

THE COURT: Mr. Benson?

MR. BENSON: Nothing further. Thank you.

THE COURT: All right. Court is adjourned.

MR. EDMONDS: Good day, Your Honor.

(Proceedings concluded at 2:16 p.m.)

--oOo--

I certify, by signing below, that the foregoing is a correct transcript of the record of proceedings in the above-entitled cause.  A transcript without an original signature or conformed signature is not certified.


*/s/Bonita J. Shumway*
_____         _____
BONITA J. SHUMWAY, CSR, RMR, CRR       DATE
Official Court Reporter

January 29, 2026