SCOTT E. BRADFORD, OSB #062824
United States Attorney
District of Oregon
**THOMAS H. EDMONDS, OSB #902555**
Tom.Edmonds@usdoj.gov
**LEAH K. BOLSTAD, OSB #052039**
Leah.Bolstad@usdoj.gov
Assistant United States Attorneys
1000 SW Third Avenue, Suite 600
Portland, OR 97204-2902
Telephone: (503) 727-1000
Attorneys for United States of America

**UNITED STATES DISTRICT COURT**

**DISTRICT OF OREGON**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | **3:26-cr-00007-IM** |
| **v.** | **GOVERNMENT'S SENTENCING MEMORANDUM** |
| **LUIS NINO-MONCADA,** | |
| **Defendant.** | |

**Introduction**

Luis Nino-Moncada fought his way out of being arrested by aggressively driving a 4330-pound, lifted pick-up truck in very tight quarters, striking a government vehicle several times, and recklessly endangering the federal agents who had surrounded his vehicle to make the arrest. Hemmed in by the government vehicle in the parking place he was in, defendant knew he was surrounded by law enforcement officers and forcefully backed up and drove forward several times, striking and damaging the side of a government vehicle and destroying its front bumper. At times during this very short sequence of events, defendant floored the accelerator to make his

way out and escape. The weight, size, noise and change in direction of the vehicle put officers in peril. Defendant's volatility also put his passenger in peril. It was only after defendant had struck the government vehicle twice, all within just a few feet of the officers' positions, one of whom was in the direct path of the truck in that sequence, that a government officer fired two shots at defendant. That conclusion can be drawn from the government's investigation, but also by evidence defendant submitted to the PSR writer, and thus this Court.

The parties are in agreement to recommend to this Court a sentence of the time defendant has served since his arrest in early January 2026 – approximately nine months. As an explicit part of his plea agreement, defendant admits he is not a United States citizen, and he is in the United States illegally. He admits that he is subject to an Order of Removal entered by an Immigration Judge on November 21, 2024, in Denver, Colorado, and agrees not to contest his removal upon completion of his sentence in this case, and he agrees not to file a habeas petition for release from immigration custody.

**Factual Background**

**A. Defendant's Background**

*Defendant's Life in Venezuela Before 2022*

Luis Nino-Moncada was born in in 1992 in Tariba, Venezuela. He had a happy childhood, was a good student and graduated from high school, and attended a private university in 2020, all in Venezuela. PSR ¶¶ 68, 71, 96-97.

Defendant told the PSR writer in this case that in 2020-2021, during the Covid-19 pandemic, he joined anti-government protests that were breaking out across Venezuela in reaction to shortages of food, water, gasoline, electricity and medicine. He contended that police

arrested and tortured him during a single day, but he was then released and allowed to return home. He said it was then "he decided to relocate to the United States." PSR ¶¶ 74-76.

*Defendant's Illegal Entry Into the United States in 2022*

Defendant entered the United States illegally on or about October 3, 2022, at or near Paso Del Norte, Texas when he had contact with U.S. officials. He was released and paroled into the U.S. and ordered to appear at a removal hearing in Denver, Colorado on November 21, 2024. Defendant failed to appear at that hearing and an immigration judge ordered his removal. After that date he was eligible for arrest and removal. PSR ¶¶ 13, 74.

Defendant told the PSR writer that after crossing the U.S. border from Mexico he flew to Denver, Colorado and made contact with "a sponsor" to begin an asylum claim. He appeared in an immigration court in Denver early in his time there, but then decided to move to Seattle, Washington. He contended that, when he decided to move to Seattle, he notified Denver immigration authorities who gave him "paperwork with instructions to appear in court at a later date." He said he lost the paperwork and feared returning to Denver because of media reports of ICE presence and missed his court date. PSR ¶¶ 77-78.

*Defendant Moves to Portland in 2025*

Defendant said he remained in Seattle until early 2025, when he moved to Portland and was in a relationship with Yorlenys Betzabeth Zambrano-Contreras, PSR ¶ 79, a then 32-year old female, only a few months younger than defendant, also a Venezuelan national, who was also illegally in the United States (obtained from data related to her prosecution in 3:26-cr-00015-SB).

In the summer of 2025, defendant was still in the relationship with Zambrano-Contreras and would frequently, if not daily, drive her to a hotel in the morning where she would work

throughout the day as a prostitute. He would drive, at times, a red 2022 Toyota Tacoma TRD Off-Road Pickup truck that belonged to Zambrano-Contreras. The truck had a three-inch lift, large off-road tires, a Curb Weight of 4,315 pounds and a 3.5-liter V6 engine with 278hp.

Between April and September 2025, defendant was stopped, cited and convicted of 13 traffic offenses:

a. April 2, 2025, convictions for driving without a license, speeding (73 in a 55 mph zone);

b. April 7, 2025, conviction for speeding (41 in a 30)

c. May 14, 2025, convictions for failure to obey a traffic control device and speeding (41 in a 30);

d. May 16, 2025, conviction for speeding (44 in a 30);

e. June 26, 2025, conviction for speeding (47 in a 30);

f. August 6, 2025, conviction for failure to obey a traffic control device;

g. August 7, 2025, his license was suspended for failure to appear;

h. September 10, 2025, convictions for speeding (86 in a 55); driving without a valid license, driving uninsured, careless driving; failure to provide proof of insurance.

*Summer 2025 Shooting Incidents Involving Tren de Aragua*

During that same summer of 2025, in early July, Washington County law enforcement responded to a shots-fired report at an apartment. When they arrived they learned from two males who said they had engaged the services of sex worker Zambrano-Contreras and their encounter ended "in a dispute." PSR ¶ 14. They said Zambrano-Contreras, after she had left the initial dispute, returned with several unknown males and tried to break into the apartment. A

single shot was fired by one of the unknown males towards one of the original customers at the apartment.

Subsequent ballistic testing of a shell casing from that shot linked it to a firearm used in a shooting that occurred four days later in Portland. *Id.* In that Portland shooting, a Venezuelan national sustained a gunshot wound to the abdomen and arm. The shooting victim told police the incident occurred after a dispute with an individual he described as a Tren de Aragua (TdA) gang member, and that two other TdA members arrived in a car, fired the single shot and fled the scene. PSR ¶ 15.

Five weeks later, in August 2025, law enforcement executed a search warrant related to a prostitution sting. Defendant and several other males were present and detained. Zambrano-Contreras was also present. She told police about the July incident she was involved in from the month before in Washington County. She admitted she had gone to an apartment to perform sex work but had fled after she was sexually assaulted and had left her belongings and money behind. Defendant responded to a text message and picked her up after she fled and took her back to a motel. She then returned to the Washington County apartment after calling a friend, "Alex," who always carried a firearm, to accompany her to recover her items. Alex and several other males accompanied her there. One of the males broke a window and she went inside to look for her items. She did not talk about the shooting. PSR ¶ 16. Defendant's statement to police while detained was limited to him saying he responded to the apartment to pick her up, that she was crying and had marks on her neck. He said he knew nothing about the shooting. *Id.*

/ / / /

/ / / /

### B. The Offense Conduct

*January 8, 2026*

On the morning of Thursday, January 8, 2026, six U.S. Border Patrol agents and their Team Leader assembled to continue immigration enforcement operations they had begun the day before. All of the agents had recently arrived in Portland, Oregon, that week from various areas in the United States where they regularly worked and lived. Each agent came with a partner they knew, but otherwise they did not know each other before working this temporary assignment. Similar Border Patrol operations were occurring around the United States in late 2025 and early 2026. The team of six agents deployed in three different government cars, which were standard rental cars, not marked law enforcement vehicles.

On January 7, 2026, the team was briefed on one of the targets for arrest they were given that week. She was Yorlenys Betzabeth Zambrano-Contreras, who was known to be in the U.S. illegally and who was suspected of working for a TdA-related prostitution ring. The briefing also included focus on defendant, who was believed to be Zambrano-Contreras' associate, also known to be in the U.S. illegally. The data provided to the officers stated that it was believed defendant was an "Associate-TDA Member/Possible shooter." The data about Zambrano-Contreras stated, "Involved with TDA prostitution ring & shooting incident in Portland, OR." The briefing data also identified "Social Media has target driving a red in color Toyota Tacoma (newer model)."

No contact with either suspect occurred on January 7, but on January 8, 2026, agents on the team saw the red Tacoma pickup while surveilling a known location for Zambrano-Contreras. PSR ¶ 18. They followed the Tacoma for several miles before entering a parking lot connected with Adventist Health Primary Care medical clinic in Portland. Agents could see the

Tacoma was driven by a male with a female adult in the front passenger seat. PSR ¶ 18. By the time the Tacoma entered the parking lot, all six agents in three cars were following it into the lot. The Tacoma parked nose-in to a marked parking spot. There was a curb and shrubbery in front of the Tacoma once it was parked. PSR ¶¶ 18-19.

The first Border Patrol vehicle, a Hyundai Sonata, to follow the Tacoma into the lot parked only a few seconds after the Tacoma, directly behind the Tacoma, with the driver's side of the Sonata perpendicular to the rear-end of the Tacoma at a distance of approximately 10 feet. Within 10-20 seconds, all three government cars had arrived and stopped, and four agents approached the Tacoma on foot, three on the driver's side and one on the passenger's. PSR ¶ 18a.

The agents were displaying badges and other indicators of being agents, such as "Police" emblazoned on their tactical vests. PSR ¶ 24-25. Those closest to the driver's and passenger's windows could clearly see and identify defendant and Zambrano-Contreras inside the vehicle. Border Patrol Agent 5 (BP5) was at the passenger side and BP2 at the driver's, and both gave orders in English and Spanish for the occupants to get out of the vehicle. BP5 saw Zambrano-Contreras shake her head no and try to manually lock her door. BP5 saw defendant looking straight ahead. BP2 gave similar commands and saw defendant looking agitated. When BP2 saw defendant begin to put the Tacoma in gear, he yelled that there was a car behind him, but defendant reversed the Tacoma in a quick and violent manner. BP1 had also been alongside the driver's window and, when he saw defendant ignoring the commands, attempted to break the driver's door window with the barrel of his rifle. His efforts failed and defendant reversed the truck.

The reverse action came with a change in angle, and the front right corner of the Tacoma made contact with BP5's chest as it reversed. The Tacoma struck the driver's side of the Sonata, doing damage, and then suddenly lurched forward having changed angle in both the reverse and forward movements. Upon the sudden and very fast lurch forward, BP5, who was originally on the passenger side, found himself in the direct path of the Tacoma and moved across the front of the Tacoma to avoid being hit. Within a second, the Tacoma backed up again and made additional contact with the driver's side of the Sonata. The repeated changes in angle now put the Tacoma much closer to parallel with the Sonata than its original perpendicular position. BP5 unholstered his service weapon and fired two shots at the driver through the driver's door window. PSR ¶¶ 28, 31. All of that activity occurred within 3-5 seconds. (Govt. Exh. 1)

Defendant was struck in the arm with one of the bullets and another grazed his chest; Zambrano-Contreras was hit with one bullet in the chest. PSR ¶ 20. Defendant floored the accelerator to the Tacoma, which had latched on to the front end of the Sonata. The force of acceleration caused the Tacoma to fishtail violently in the rear end of the truck. The Tacoma tore the bumper of the Sonata off, doing extensive damage, and then fled out of the parking lot away onto public streets.

The Sonata was declared a total loss as a result of the Tacoma's repeated contact. The front bumper was torn off, both headlights were destroyed, the front driver's side quarter panel was dented, front driver's side fender liner detached, and the rear driver's side passenger door and quarter panel dented. PSR ¶ 22.

Defendant drove to an apartment complex and called 9-1-1, to which Portland Police responded. Both defendant and Zambrano-Contreras were treated at local hospitals, and released, defendant to federal custody and Zambrano-Contreras to ICE custody. PSR ¶ 20.

Portland Police first interviewed the defendant when he had arrived at the hospital; he was interviewed again at the hospital by the FBI. In his first statement to PPB, he said he was approached after parking his truck by "15 men wearing masks and green uniform." He said he thought the men were "gangsters." He said he drove backwards and forwards and that officers broke his window and shot him. He was inconsistent about whether the shots were fired before or after he moved his truck. PSR ¶ 33.

To the FBI, defendant said he had parked the truck at the medical facility for Zambrano-Contreras' appointment and that multiple cars pinned him in and that 15 officers, wearing masks, yelling "ICE!" He said Zambrano-Contreras panicked and he feared being "disappeared," knowing the agents were immigration enforcement officers, so he started driving back and forth, knowing he struck one of the Border Patrol vehicles as he tried to get away. He said officers began smashing his windows and he heard gunshots and felt a stinging in his arm and grazing on his chest. He then saw Zambrano-Contreras had been shot in the breast and was bleeding. He drove to a friend's apartment where he called 9-1-1. PSR ¶¶ 34-36.

The six Border Patrol agents involved in the arrest attempt were all interviewed by the FBI. Agents conducted a canvass of the surrounding area and buildings to the Adventist Health facility. One eyewitness was ultimately found and interviewed by the FBI. The FBI also obtained two surveillance camera videos from a business called FORA Health. Both videos were enhanced and gave some but a limited view of the critical aspects of precisely when the shots were fired in the incident. One of the videos did, though, show the movements of the Tacoma quite clearly. Govt. Exh. 1 (Enhanced Video Clip).

The eyewitness was an uninvolved individual who had driven into the parking lot, for a medical appointment, and was approaching a parking spot on the opposite side of a curb and

shrubbery between where the Tacoma had parked and her intended parking spot. She noticed a commotion in front of her and saw the Tacoma perpendicular to her and three officers who were dressed in black vests that said, "Police," wearing masks. She recalled hearing 3-4 gunshots and seeing the driver's door window to the Tacoma break. She said she did not see anything leading up to the shooting, that the truck was approximately 15 feet in front of her and that the officer was approximately two feet from the truck when he shot. She said the Tacoma never stopped moving and saw the truck drive over something before fleeing the parking lot. PSR ¶ 24.

During FBI interviews, the six BP agents each gave statements, part of which included:

BP1 said he approached the driver's side of the Tacoma; he saw defendant looking anxious and for a way to escape; BP1 unsuccessfully tried to break the driver's window with his rifle. PSR ¶ 27.

BP2 said he was BP5's partner and arrived in the Sonata; BP2 went to the driver's side and saw defendant looking agitated and BP2 warned defendant there was a vehicle behind him, but defendant reversed in a quick and violent manner, to where BP2 was concerned for his own safety and stepped back to avoid being hit. He was also concerned for civilians who might be in close proximity to the incident. PSR ¶ 28.

BP3 said he approached the driver's side of the Tacoma upon arrival and saw defendant ramming the Toyota into the Sonata, driving back and forth. He heard two shots and saw BP5 at the front corner of the vehicle. PSR ¶ 29.

BP4 said after he got out of his car, the Toyota violently rammed the Sonata multiple times. Defendant's activity prompted BP4 to unholster his service weapon, but he held it pointed to the ground. He saw BP5, standing near the front left side of the Toyota, fire two rounds into the driver's side window. PSR ¶ 30.

BP5 said he was first to arrive behind the Tacoma and he and his partner, BP2, approached the vehicle on opposite sides, BP5 on the passenger side. He saw and identified Zambrano-Contreras as the passenger. He and BP2 shouted orders to the two occupants to get out of the car, in English and Spanish. Zambrano-Contreras shook her head no and then tried to manually lock her door. When the occupants appeared non-compliant, BP1 tried to break the driver's door window with his rifle. Defendant put the truck in reverse and began backing up while turning. The Tacoma's front end made physical contact with the left chest area of BP5. BP5 heard the engine rev and the Tacoma slam into the Sonata. The truck then went forward and BP5 found himself in the direct path of the forward moving truck and believed defendant was trying to kill him. BP5 retrieved his holstered weapon and fired two shots into the driver's door window. The truck backed up again and defendant revved one more time at full force and pushed through the gap he had created. BP5 ceased using deadly force when he believed he and other officers were out of the way of the Tacoma's path. The Tacoma crushed through the driver's side of the Sonata's bumper and drove out of the parking lot. PSR ¶ 31.

BP6 said he approached the Tacoma and identified himself as a Border Patrol agent. The truck proceeded to move forward and backward at a high rate of speed, changing directions several times. BP6 heard another agent yell, "Shoot him!" BP6 then heard two gunshots and saw BP5, who was in front of the Tacoma jump out of the way and discharge his firearm through the driver's side window. BP6 said BP5 had been in danger and if he (BP6) had been in a similar position, he would have fired. PSR ¶ 32.

Defendant, as part of objections to the draft PSR, submitted a forensic report to the U.S. Probation Office and the Court. The report drew several conclusions. One of those conclusions was that the shots were fired "after the Toyota started moving forward and into the left corner of

the [Sonata]." Talbott Associates, Inc. Report (Talbott Report) of August 4, 2026, at 2 (this conclusion is not included in the Final PSR). The PSR does include a second opinion offered by the defense report: "When the shots were fired into the side of the Toyota, the shooter was not in a position to have been run into or over by the Toyota." PSR ¶ 32a; Talbott Report, at 2.

There are two deficiencies with both the Talbott Report's second conclusion discussed here, and the PSR's exposition of it. First, neither the PSR, nor the Talbott Report, explicitly acknowledge that by the time the shots were fired, the Tacoma had violently reversed, lurched forward, and then reversed again, striking the Sonata, all within close proximity to the BP officers, and specifically BP5.

Second, the finding in the Talbott Report, and repeated by the PSR, make no reference to the period of time in which this occurred. The time between the lurch forward of the Tacoma, directly towards BP5, and the reversed position parallel with the Sonata upon second impact was no more than 3-5 seconds. This is a fact that can be easily discerned by watching just one of the FORA Health videos. Govt. Exh. 1. Instead, defense counsel in his submissions to Probation and the Court relies instead on video footage showing the "reaction" of "an individual walking around the medical facility at the time of the shooting." Although the Talbott Report did extensive frame-by-frame analysis of the critical video, and acknowledged, "The Toyota quickly accelerated forward and stopped abruptly. It then reversed in a left turn direction and came to a stop next to the [Sonata]," Talbott Report, at 7, it gave no recognition to the amount of time those movements took, even though the report acknowledges that "the videos were recorded at nominally 15 frames per second." Frame 3648 and Frame 3712 (64 frames divided by 15), *see* Talbott Report, at 6-7, would result in a time of 4.3 seconds between the truck stopping abruptly in its lurch forward and then being alongside the Sonata after reversing. The report's opinion

places the shooting within that sequence of time. The PSR's reliance on the "reaction" of the civilian in the area has no frame-by-frame or time analysis in the report, *see* Talbott Report, at 8, and is simply a supposition of "defense counsel" "note[d] in their attached objection letter . . . ." PSR ¶ 32a. The Talbott Report supports that the shooting officer's reaction in shooting after the Tacoma nearly ran him over was reasonable in the face of such danger occurring within those brief seconds.

The loss to the government as a result of defendant's conduct underlying the Depredation charge is $24,413.00. Defendant has, in his plea agreement with the government, agreed to pay that amount to the government as restitution. PSR ¶¶ 10, 45.

**C. The Charge**

On July 27, 2025, defendant pleaded guilty to Count Two of an Indictment charging Depredation of Federal Property, a violation of Title 18, United States Code, Section 1361. In his plea agreement, defendant stipulated to the following facts:

> On January 8, 2026, defendant drove into the parking lot of Adventist Health Portland in a red Toyota Tacoma pickup truck. Defendant had a passenger in the truck, AW1. After defendant parked, a Border Patrol agent parked his government black Hyundai Sonata behind the Toyota Tacoma. Six Border Patrol agents exited their vehicles and surrounded the Toyota Tacoma. Defendant later indicated he believed they were "ICE" agents. Then, defendant backed up his pickup truck forcefully into, and made contact with, the Black Hyundai several times in an attempt to flee. Then, a federal officer fired his service weapon at defendant after defendant had backed into the Hyundai Sonata and caused damage. The Hyundai Sonata was declared a total loss as a result of the damage from the Tacoma, with damage in excess of $10,000. Defendant's conduct placed others at risk of serious bodily injury, and defendant was conscious of or recklessly disregarded that risk.

/ / / /

/ / / /

**Sentencing Guidelines and Government Recommendation**

The parties agree the following guidelines apply in this case:

| **Count 2: 18 U.S.C. § 1361 – Depredation of Federal Property** | | |
|---|---|---|
| USSG § 2B1.1(a) | Base Offense Level | 6 |
| USSG §2B1.1(b)(1)(C) | Loss in excess of $10,000 | +4 |
| USSG §2B1.1(b)(16)(A) | Conscious or reckless risk of death or serious bodily injury | Increase to level 14 |
| USSG §3E1.1(a) | Acceptance of Responsibility | -2 |
| | **Total Offense Level** | 12 |
| | **Criminal History Category** | I (PSR at ¶63) |

By plea, the government jointly recommends with the defense that this Court impose a sentence of the time defendant has served since his arrest in early January 2026.

In the assessing the advice given by the sentencing guidelines (advisory range is 10-16 months), and then the facts of this case, coupled with defendant's agreement to an uncontested removal from the United States, the government submits the joint recommendation is for a reasonable sentence. Defendant's reckless conduct initiated and brought about the facts that ensued. He has admitted to causing intentional damage to government property and reckless conduct placing another at risk of serious bodily injury. Although the parties disagree about the extent to which defendant's recklessness extended, that disagreement is moot as to the calculations under the Guidelines. Nevertheless, the government submits that the conduct in this case supports the sentence of what results – approximately nine months of incarceration, imposition of a sizable restitution obligation, and the consequences of this conviction to his status within the United States.

/ / / /

/ / / /

/ / / /

**Conclusion**

Based on the foregoing, the government recommends a sentence of time-served, one year of supervised release, $24,413.00 in restitution for all losses caused by defendant's conduct of conviction from Count Two, and imposition of a $100 fee assessment.

Dated: September 11, 2026.

Respectfully submitted,

SCOTT E. BRADFORD
United States Attorney

*<u>/s/ Thomas H. Edmonds</u>*
THOMAS H. EDMONDS, OSB # 902555
LEAH K. BOLSTAD, OSB #052039
Assistant United States Attorneys